## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DANNIEL B. [1],**

        **Plaintiff,**

**v.**

**KILOLO KIJAKAZI,**
**Acting Commissioner**
**of Social Security,**

        **Defendant.**

**Case No. 22-cv-01507-SPM**

## <u>MEMORANDUM AND ORDER</u>

**McGLYNN, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) benefits and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423 and 42 U.S.C. §§ 1382 and 1382c, respectively[2] (Doc. 1).

### PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI benefits in November 2013, alleging an onset date of October 15, 2010. (Tr. 201, 208). The application was initially denied on January 28, 2014 (Tr. 133), and it was denied upon reconsideration on November 14, 2014 (Tr. 142,

---

[1] In keeping with the court's practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.,* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.,* and 20 C.F.R. pt 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

146). On December 2, 2014, Plaintiff requested an evidentiary hearing (Tr. 150), which was held before Administrative Law Judge ("ALJ") Kevin Martin on September 24, 2015. (Tr. 32-68). On October 14, 2015 the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 9-31). On December 9, 2015, the Appeals Council denied Plaintiff's request for review (Tr. 1-6). On January 14, 2016, Plaintiff filed a complaint in the Northern District of Illinois. (Tr. 738-744). On August 29, 2017, U.S. Magistrate Judge Maria Valdez reversed and remanded the decision, finding that ALJ Martin improperly weighed the opinions of Plaintiff's treating psychiatrist, Dr. Linda Hungerford (Tr. 745-757).

On remand, a hearing was held on February 6, 2018 before ALJ Kevin Martin (Tr. 696-708). On February 23, 2018, ALJ Martin issued his decision and again denied Plaintiff's claim for benefits. (Tr. 669-695). In August 2018, Plaintiff's second complaint was transferred to this district from the Northern District of Illinois. (Tr. 738-744). On May 8, 2019, U.S. Magistrate Judge Donald Wilkerson reversed and remanded the decision, again finding that ALJ Martin improperly weighed Dr. Hungerford's opinions (Tr. 1085-1099). On remand again, the Appeals Council directed that this matter be assigned to a different ALJ. (Tr. 1081-1084). On November 4, 2019, a hearing was held before ALJ Michael Scurry[3] (Tr. 1018-1052). On November 22, 2019, ALJ Scurry denied Plaintiff's claim for disability, DIB, and SSI. (Tr. 987-1017). Shortly thereafter, Plaintiff filed a third complaint in the Southern District of Illinois. On September 21, 2021, U.S. Magistrate Judge Reona Daly reversed and remanded the decision, again looking at the

---

[3] This Court notes that this was Plaintiff's third evidentiary hearing, albeit the first before ALJ Michael Scurry.

psychological opinions and medical opinions regarding Plaintiff's ability to stand and sit post lumbar surgery. (Tr. 2096-2115). On October 6, 2021, the Appeals Council sent this matter back to an ALJ. (Tr. 2116-2120).

On April 12, 2022, ALJ Michael Scurry conducted another evidentiary hearing[4]. (Tr. 1931-1946). On April 27, 2022, ALJ Scurry issued an unfavorable decision, denied Plaintiff's application, finding him not disable under sections 216(i) and 223(d) of the Social Security Act. (Tr. 1889-1930). Accordingly, on July 13, 2022, Plaintiff filed the most recent complaint before this Court. (Doc. 1).

### ISSUES RAISED BY PLAINTIFF

In his brief, Plaintiff raises the following issues:

**I.     An Updated Medical Expert Review of the Medical Records Submitted Since the Last State Agency Review in November 2014 Was Necessary; and,**

**II.    The ALJ Assessed the Disabling Opinion of the Treating Psychiatrist Improperly.**

### STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal

---

[4] This was Plaintiff's fourth evidentiary hearing and the second before ALJ Scurry.

citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence and requires the court to remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work

activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth five questions for the ALJ to consider in assessing whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment enumerated in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him unable to perform his past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Kuhn v. Kijakazi*, No. 22- 1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## DECISION OF THE ALJ

In reaching his decision, the ALJ considered the documents on file, the hearing testimony of the three prior evidentiary hearings as well as Plaintiff's medical records.

At step one, the ALJ concluded Plaintiff did not engage in substantial gainful activity from the alleged onset date of October 15, 2010, and meets the insured status

requirements of the Social Security Act through March 31, 2015. (Tr. 1894). At step two, the ALJ concluded that Plaintiff has the following severe impairments: degenerative disc disease status post-fusion in August 2014; failed back syndrome; sacroiliitis; obesity; dysthymic disorder; mood disorder; generalized anxiety disorder (GAD); personality disorder; post-traumatic stress disorder (PTSD); obsessive-compulsive disorder (OCD); and attention-deficit hyperactivity disorder (ADHD). (Tr. 1894-1895).

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 1895).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work[5] as defined in 20 CFR 404.1567(b) and 416.967(b) except he could occasionally climb ramps and stairs. (Tr. 1898). He could never climb ladders, ramps, or scaffolding. (*Id.*) He could occasionally stoop, kneel, crouch, and crawl. (*Id.*). He must avoid concentrated to exposure to hazards such as unprotected heights. (*Id.*). He could understand, remember, and apply information for short, simple instructions, and could concentrate, persist, and maintain pace for such short simple tasks in a routine setting. (*Id.*). He could not interact with the public. (*Id.*).

In coming to this conclusion, the ALJ considered all of Plaintiff's symptoms and the

---

[5] (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

extent to which these symptoms could reasonably be accepted as consistent, along with the objective medical evidence and the opinion evidence. (*Id.*). The ALJ also considered Plaintiff's testimony at his three prior hearings, along with the Function Report and Physical Impairment Questionnaire filled out by Plaintiff in 2013. (Tr. 1898).

With respect to Plaintiff's symptoms, the ALJ followed the two-step process where he first determined whether there was an underlying medically determinable physical or mental impairment that could be reasonably expected to produce the claimant's pain or symptoms, then he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit Plaintiff's work-related activities. (Tr. 1898-1899). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms was not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision. (Tr. 1901). The ALJ found that the evidence of record did not support a finding that Plaintiff's condition is of such a severity to prevent the performance of a light RFC with limitations and modifications. (Tr. 1899).

With respect to Plaintiff's mental health, the ALJ emphasized that the medications have worked to control Plaintiff's symptoms and that his mental health treatment was fairly limited and conservative. (Tr. 1901). Because of this, the ALJ did not believe that the impairments were as severe as Plaintiff alleged. (*Id.*).

The ALJ gave little weight to the initial assessment performed by Dr. Julio Pardo, who opined Plaintiff could perform medium work. (Tr. 1912). The ALJ gave

great weight to the physical assessment performed by Dr. B. Rock Oh on reconsideration, and found it was consistent with the evidence showing Plaintiff's degenerative spine changes and remaining physical abilities. (*Id.*). Although a treating neurologist, Dr. Pradeep Narotam, assessed a combination of physical limitations that would result in a finding of disability, the ALJ gave his opinions little weight because they conflicted with the limited medical findings. (*Id.*).

In conclusion, the ALJ found that his RFC assessment is supported by portions of the state agency determinations, a portion of the opinion of Dr. Boyd, some of Plaintiff's activities, and the record as a whole pursuant to SSR 96-8p. (Tr. 1917). He further found there was no objective evidence to support a conclusion that Plaintiff would be unable to persist at that level and that Plaintiff failed to meet his burden of showing further limitations in accordance with SSR 16-3p. (*Id.*).

At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could have performed. (Tr. 1918). The ALJ was persuaded by the testimony of the vocational expert from the November 4, 2019 hearing who testified that a person with Plaintiff's age, education, work experience, and RFC could perform occupations which existed in the national economy, such as assembler, hand packer, or inspector. (*Id.*). Thus, because Plaintiff could make a successful adjustment to this other work, a finding of "not disabled" was appropriate. (Tr. 1919).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is

directed to the points raised by Plaintiff.

### 1.  Agency Forms

Plaintiff was born on September 19, 1972. (Tr. 201, 208). He alleged a disability onset date of December 15, 2010. (*Id*.). As for physical and mental conditions that limited his ability to work, he indicated: (1) Mood disorder; (2) PTSD (3) OCD; (4) ADHD; and, (5) Back problems. (Tr. 70, 226).

Plaintiff completed function reports in August 2014 and December 2013. (Tr. 245-259, 280-289). He referenced severe anxiety, depression, obsessive thoughts, impulsive behaviors, inattentiveness, impulsivity, hyperactivity, interpersonal relationship problems, and shortness of breath/panic attacks. As for daily activities, Plaintiff stays home with the curtains and blinds drawn and does not answer the phone or the door. He lies in bed in pain or paces. He watches TV in his room and occasionally reads a book. He does not do yard work and does not like being in public. He no longer has the urge to fish or do the things he loved.

A work history report was completed in December 2013. (Tr. 260-271). Plaintiff last worked as a fabricator, making window frames and installing hardware, from 2004-2009.  Prior to this position, Plaintiff worked as a car detailer from 2002-2004 and from 1999-2002, and also worked as a trash picker from 1998-1999.

### 2.  State Agency Examiners

In January 2014, state agency physician Dr. Julio Pardo assessed Plaintiff's physical RFC at the initial level and Dr. M.W. DiFonso assessed Plaintiff's mental RFC following the Psychiatric Review Technique ("PRT"). (Tr. 70-81). Dr. Pardo found that Plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, stand/walk 6

hours in an 8-hour workday and sit 6 hours in an 8-hour workday. Dr. Pardo noted some postural and environmental limitations, but no manipulative, visual, or communicative limitations. (*Id.*). The environmental limitations were needed due to the sleepiness caused by Paxil. (*Id.*). Dr. DiFonso found that Plaintiff had understanding and memory limitations, sustained concentration and persistence limitations, and social interaction limitations, but no adaptation limitations. (*Id.*). Based on the documented findings, Plaintiff was found to have a medium physical RFC and to be "Not Disabled" by disability adjudicator. (*Id.*).

In November 2014, state agency physician Dr. B. Rock Oh reconsidered Plaintiff's physical RFC while Dr. Howard Tin reconsidered Plaintiff's mental RFC. (Tr. 96-113). Dr. Oh found Plaintiff's RFC to be light, not medium, but still determined he was "Not Disabled". (Tr. 112). As for Dr. Tin and the MRFC, he noted that Plaintiff indicated his depression and anxiety had increased and he recommended a consultative examination which was completed in October 2014. (Tr. 97, 102). Dr. Tin determined Plaintiff's activities of daily living were mildly restricted while his difficulties in maintaining social function and concentration, persistence or pace were moderate. (Tr. 105).

### 3. Evidentiary Hearings

Four separate evidentiary hearings have been held with Plaintiff.

**First Hearing – September 24, 2015**

ALJ Kevin Martin conducted the first hearing in Evansville, IN on 9/24/2015. (Tr. 34). Plaintiff, his attorney Joseph Horn, and VE Theresa Wolford appeared via in person. (*Id.*).

Plaintiff resides in Robinson, IL in a one-story house with Tatura Rich and his

three minor children aged 16, 13, and 9. (Tr. 38). Ms. Rich works and pays the mortgage. (Tr. 39). Plaintiff does not have a driver's license due to a DUI several years prior. (*Id.*). Plaintiff completed 10th grade but has not obtained his GED. (*Id.*). He is 5'11" and weighs 265. (Tr. 40). He is right-handed wears a back brace but does not use an assistive device. (*Id.*). Plaintiff has not worked since the onset date in October 2010 nor has he done any volunteer work. (*Id.*).

He has not applied for or received any unemployment benefits or workers' comp. (Tr. 41). He has received vocational rehab for his back. (*Id.*). Ms. Rich has been supporting him, but he has a medical card. (*Id.*). Plaintiff's last job was at Tempco Products in Robinson, IL where they made windows. (*Id.*). He worked as a balance fabricator and was on his feet most of the time. (Tr. 42). He lifted between 25-50 pounds and was fired for missing too much work due to mental issues and back problems. (*Id.*). Before Tempco, he worked at Ick Chevrolet detailing cars and didn't have to lift any weight. (*Id.*).

Plaintiff has degenerative disc disease and had a back operation when he got 6 screw and 2 rods inserted. (Tr. 43). Plaintiff cannot sit or stand very long and it is hard to walk due to the pain in his lower back into his hips. (Tr. 43-44). His pain is constantly an 8/10 but increases with movement. (Tr. 44). He takes OTC meds 2-3 times a day because Dr. Tennyson won't prescribe narcotics. (*Id.*). The surgery helped to a small extent. (Tr. 45). Plaintiff has considered pain management. (*Id.*). He also uses hot baths and cold compresses and massages to help relieve the pain. (*Id.*).

Plaintiff's other issue is mental illness – anxiety, depression, OCD, ADHD, and PTSD that he has had most of life due to an abusive step-father. (Tr. 46). Medication

has helped him cope, but it doesn't take away the problem. (*Id.*). Dr. Tennyson prescribes Alprazolam (Xanax) for anxiety, Wellbutrin for depression, and another med for bipolar and schizophrenia. (*Id.*). The meds make him sleepy and he takes 2-3 naps a day. (Tr. 52). He stopped treating with Dr. Hungerford and the therapist because he did not feel it was very helpful and it is an hour drive and gas was an issue. (*Id.*). He is shaky from the anxiety and nervousness and it is hard to be around people. (Tr. 47). He had the same problems when he worked, but he tried to do the best he could. (*Id.*).

On a typical day, Plaintiff gets up very early because his back hurts so he moves to his chair. (*Id.*). He lays and watches TV or sits in his chair with his feet up because his legs and ankles swell when he is on his feet too long. (*Id.*). He cannot really recall what he watches. (Tr. 56). He uses ice packs and reclines to help the swelling. (Tr. 53). Ms. Rich does the cooking and housework. (Tr. 48). He cannot carry the laundry baskets. (*Id.*). He doesn't do the shopping and has a hard time in crowds at the store. (*Id.*). Plaintiff is a loner and stays at home. (Tr. 49). He doesn't do any yardwork or gardening. (*Id.*). His only hobby is watching TV. (*Id.*). He is not computer friendly and doesn't play video games. (Tr. 50).

He can sit for ½-1 hour at a time depending on the chair and can stand for 30-45 minutes at a time. (Tr. 51). He doesn't walk much and can only carry 6-10 pounds. (*Id.*). After walking, he needs to catch his breath and rest his back. (Tr. 53). Loud noises scare him. (Tr. 54). He smokes a pack a week but does not drink. (Tr. 52). The only drugs he uses are his prescriptions. (*Id.*). His weight and back issues are what docs say cause the swelling and they recommend exercise. (Tr. 58).

Ms. Rice made Plaintiff call Dr. Hungerford because he needed to talk to someone. (Tr. 59). Although Plaintiff claims he was disabled in 2010, he did not file for 3 years because he was embarrassed and scared. He shakes from his anxiety. (*Id.*).

He went to doctor in Terre Haute, IN, which was 45 minutes away and trip was painful so they had to take rest breaks on the way. (Tr. 55). The drive to hearing was 2 ½ hours "of murder" and they made 5 stops on way. (Tr. 56). He reclines seat as far back as it will go and adjusts it a lot. (*Id.*).


VE Theresa Wolford reviewed Plaintiff's file and was familiar with his background. He shakes from his anxiety. (Tr. 59). She classified his prior employment as Auto Detailer, DOT code 915.687-034, SVP 2, medium, and Assembler production, DOT code 809.684-010, SVP 3, medium. (Tr. 60).

For her first hypothetical, she opined that an individual of same age, education and work background who was able to perform full-range of work at light level except can frequently climb ladders, ropes, and scaffolding, frequently stoop, need to avoid concentrated exposure to hazards such as unprotected heights, able to understand and carry out short, simple instructions for simple tasks in work setting with no interaction with general public, could not perform any of past work. (Tr. 61). That individual could perform other work such as Cleaner housekeeping, DOT 323.687-014, SVP 2, light; Routing clerk, DOT 222.687-022, SVP 2, light; and, Folding machine operator, DOT 208685-014, SVP 2, light. (*Id.*).

For the second hypothetical, the ALJ asked the vocational expert to assume full

range of light work except occasional stoop, crouch, kneel, and crawl, with avoidance of concentrated exposure to hazards such as unexpected heights, ability to understand and carry-out simple instructions for simple tasks in a work setting without interaction with general public. (Tr. 62) There is no change in work available from first hypo. (*Id.*).

For the third hypothetical, the ALJ added additional restrictions and reduced level to sedentary and no more than occasional interaction with coworkers and supervisors. (*Id.*). VE opined that jobs would be Final assembler, DOT 713.687-018, SVP 2, sedentary; Table worker, DOT code 739.687-182, SVP 2, sedentary; and, Document preparer, DOT 249.587-018, SVP 2, sedentary. (Tr. 62).

For the fourth hypothetical, 3 missed days of work per month under the 3 prior hypotheticals removes all work able to be performed. (Tr. 63).  The DOT does not address absenteeism. (*Id.*). Typically most employers will tolerate 2 absences in a month with unskilled workers. (*Id.*). Work would also be precluded if the individual is off task for an unscheduled hour per day. (Tr. 64). If a person has to elevate his legs to heart level for an unscheduled hour per day, that would take him off task enough to preclude employment. (*Id.*). With unskilled work, there is not a lot of tolerance for difficulty performing tasks, irregular attendance, or tardiness. (*Id.*). Somebody who cannot complete a full day is unemployable. (*Id.*). Typically employers will tolerate 15% of an individual being off task. (Tr. 65).

### Second Hearing – February 6, 2018

Plaintiff's second hearing was held with ALJ Kevin Martin on 2/6/18. (Tr. 696-708).  VE Dr. Minkus was present but did not testify.

Plaintiff has not worked since prior hearing nor has he had any education or training. (Tr. 701). His back pain has gotten worse and he has been receiving epidurals for the pain. (*Id.*). Some of the epidurals last for a couple of months or a month, but some do not help at all.  (Tr. 702). The pain can be 10/10 and is in his lower back into his hips. (*Id.*). Plaintiff also takes 600 mg Gabapentin for the pain, which help "some" but doesn't take the pain away. (Tr. 703). No additional treatment is being considered and he hasn't been evaluated for additional surgery. (*Id.*).

As for his mental health he is on medications and being treated by Dr. Tennyson. (*Id.*). The medications sometimes help - he has good days and bad days. (Tr. 703-704). The good days did not happen very often. (Tr. 704). He had more nervousness, anxiety, and depression on the bad days. (*Id.*). Nothing has changed for the better since the first hearing. (Tr. 705). The depression and pain have gotten worse. (*Id.*). He cannot concentrate 80 percent of the time and he cannot be on his feet more than two hours out of eight. (*Id.*). He still sleeps a lot from his medication. (*Id.*). He also has to elevate his legs because of swelling. (*Id.*).

ALJ did not feel it was necessary to call VE since he took testimony at the first hearing. (Tr. 706)

### Third Hearing – November 4, 2019

The third evidentiary hearing was conducted by ALJ Michael Scurry. (Tr. 1018-1052).

Plaintiff resides with his girlfriend and their 3 year old daughter. (Tr. 1025). He has not worked since Timko Products as a frame fabricator making windows. (Tr. 1028). He was there about 5 years and had serious back issues and could no longer physically

do the job so he was let go. (Tr. 1029). Plaintiff said his back is what keeps him from working. (Tr. 1032). He has degenerative disc disease and had back surgery in August 2014 when they did a spinal fusion and inserted 6 screws and 2 rods. (*Id.*). He recalls the surgeon telling him that he would only return to "50%" following surgery (*Id.*). There was "not much" improvement following the surgery. (Tr. 1033). He gets steroid injections from a pain management doctor and recently had one in September. (*Id.*). The injections help with the pain for a short while, but do not last more than a month or two before he has to go back and get another shot. (Tr. 1033).

Plaintiff said his mental illness, anxiety, depression, PTSD, OCD, and ADHD also keep him from being able to do things. (*Id.*). He has had those issues since childhood due to an abusive stepfather. (Tr. 1084). He started receiving treatment for his mental health around 2014. (*Id.*).  Plaintiff has "more bad than good" days. (Tr. 1035). His medications continue to make him drowsy. (Tr. 1035). He naps for at least two hours a day and spends most of his time either lying in bed on a heating pad, or in a recliner with his feet up because of swelling in his legs (Tr. 1035). Plaintiff estimated that his feet are elevated approximately 60-90 minutes a day. (Tr. 1039). He doesn't think he could stand or walk more than an hour or two or concentrate more than 80% of a day. (*Id.*). He can life 9-10 pounds. (Tr. 1040).

Vocational expert James Broderie testified that he reviewed Plaintiff's file and was familiar with his background. (Tr. 1043). The VE testified that plaintiff could not perform his prior work, but did opine that there was other light, unskilled work that he could perform, including Assembler, DOT 706.6894-022, light, SVP 2; Hand packer, DOT 920-687-018, SVP 1, light; and Inspector, DOT 723.687-687-062, light, SVP 2. (Tr.

1045). However, an individual who is off-task for 15% of his time-either dozing from medications or elevating his feet-would be unemployable. (Tr. 1047). Generally, at the unskilled level (sedentary or light), there is no work available for a person who could only be on his feet for 60-120 minutes a day, only reach for 60-120 minutes a day, and lift no more than 10 pounds. (Tr. 1048).

### Fourth hearing – April 12, 2022

Plaintiff's fourth hearing was held with ALJ Michael Scurry. (Tr. 1931-1946).  VE Thomas Heiman was present but did not testify.

Plaintiff has not worked since 2010 when he was at Tempco Products in Robinson, IL. (Tr. 1940). His back pain has worsened since last hearing. (*Id.*). A recent MRI that was ordered by his pain management doctor showed that the degenerative disc disease had spread between plaintiff's shoulders and neck. (*Id.*).

Plaintiff's depression, anxiety, and insomnia have also worsened. (*Id.*). The medications help, but do not completely take it away. (Tr. 1941). His hands still tremble and shake and he still has bad anxiety. (*Id.*). He now lives with his mother because of separation from his girlfriend. (*Id.*). He tries to help around the house, but most days he has to stop what he is doing and sit down and recline because of pain and because his legs tend the swell. (Tr. 1942). He elevates his legs for several hours or lays down. (*Id.*). The epidurals held with the pain but do not give long lasting relief. (*Id.*). The medications still make him drowsy and he still naps. (Tr. 1943).

### 4.  Relevant Medical Records

This Court adopts and reiterates the medical records summary prepared by Magistrate Judge Reona Daly in Plaintiff's prior matter, 20-cv-00145-RJD; however,

will update accordingly.

"Dr. William McDonald at the Crawford Memorial Hospital Bone and Joint Center in Robinson, Illinois treated Plaintiff for a broken left ankle injury in 2011-2012. Dr. McDonald made the following entry on January 6, 2011: He states that on 12/31/10 he fell off an approximately 6' wall and he was actually kind of bumped and pushed by his buddy and he said when he lost his balance he figured he could jump down and land okay but when he jumped he landed on his heels and immediately had pain. He states that the pain was and still is a 10/10…He states he is not having any back pain, not having any hip pain (Tr. 344). Dr. McDonald saw Plaintiff multiple times in 2011 and 2012 for left foot pain (Tr. 331- 346). None of Dr. McDonald's notes indicate that Plaintiff complained of back pain (*Id*.).

Plaintiff sought mental health treatment from the Jasper County Health Department in October 2013. A therapist, Sharon Helregel, developed a treatment plan related to Plaintiff's depression, anxiety, lack of coping skills, and adaptive functioning deficit (Tr. 361-369). The plan included one hour of individual counseling a week, and one hour of family therapy/counseling (Tr. 367). Helregel signed the plan in October 2013 and one month later, a psychiatrist (Dr. Hungerford) signed the plan (Tr. 369). Also in October-December 2013, Plaintiff sought treatment from Dr. Gary Tennison at the Crawford Memorial Hospital Rural Health Clinic (Tr. 375-380). He reported that he was receiving therapy from Sharon Helregel, and she thought he needed medication but the psychiatrist on staff at the Jasper County Health Clinic did not have any openings to see him (Tr. 378). Plaintiff further reported that he was depressed, irritable, panicky, anxious, and had a "lot of ups and downs" (Tr. 378). Dr. Tennison noted that Plaintiff

had tried to commit suicide "2-3 years ago" (Tr. 378). It was difficult for Plaintiff to get out of the house or even out of bed (Tr. 378). Plaintiff also complained of low back pain for the last year that became worse when he walked or sat (Tr. 469). Dr. Tennison prescribed Paxil and Rispderal for Plaintiff's depression/anxiety and Mobic for Plaintiff's back pain (Tr. 376, 471). He also gave Plaintiff pain medication and steroid injections (Tr. 471). Dr. Tennison ordered an MRI in January 2014 that revealed Plaintiff had a "small central disc protrusion at L5-S1" and a "mild broad-based posterior disc bulge at L4-5" (Tr. 412). On March 5, 2014, Dr. Tennison noted that Plaintiff had "just witnessed daughter's death after resuscitation, doesn't feel like Paxil is giving him relief or working, getting shortness of breath and tightness of chest" (Tr. 466). Plaintiff had thoughts of suicide (Tr. 466). Dr. Tennison discussed grief counseling with him and prescribed Xanax (Tr. 468).

Plaintiff presented to the Crawford Memorial Hospital Emergency Department on March 25, 2014 (Tr. 413). He complained of back pain, rating it 10/10 (Tr. 413). He reported that it became worse with walking or other movement (Tr. 413). The ED physician's impression was "acute exacerbation of chronic back pain" and he ordered one dose of Dilaudid for Plaintiff (Tr. 414). Plaintiff presented to Dr. Tennison on April 2, 2014 and asked to be referred to a neurosurgeon for his back pain (Tr. 459). Plaintiff saw Dr. Pradeep Narotam (a neurosurgeon) at Union Hospital in Terre Haute, Indiana on April 23, 2014 (Tr. 508). Dr. Narotam's physical exam summary stated "tender lower lumbar spine with bilateral lumbar paraspinal muscle tenderness, mild spasm, no triggers. Mild hip flexor weakness related to back pain, mild knee extensor weakness" (Tr. 505). Dr. Narotam reviewed Plaintiff's MRI images and diagnosed him with lumbar

spondylothesis, degenerative disc disease, herniated lumbar disc, myofascial pain syndrome (Tr. 505). He recommended conservative treatment: lose weight, therapy, "keep moving to keep muscles looser," and a caudal block (Tr. 505). Dr. Narotam further noted that Plaintiff "may work as he is able." (Tr. 509).

Plaintiff saw his therapist, Sharon Helregel, approximately 1-4 times a month from November 2013-July 2014 (Tr. 653-666). According to her treatment notes, he described conflict with his girlfriend regarding the death of their infant child in March 2014 (Tr. 657). He also discussed social anxiety and his fears of working with other people (Tr. 656), and the "hurt" he sustained from his mother and stepfather (Tr. 665). In May 2014, Helregel prepared another Treatment Plan similar to Plaintiff's October 2013 plan (Tr. 425-435).

Plaintiff returned to see Dr. Narotam on June 18, 2014 (Tr. 512). Plaintiff completed a questionnaire that indicated he could not sit for more than one hour or stand for more than 30 minutes (Tr. 515). Dr. Narotam noted that Plaintiff tried therapy but was discharged after receiving a steroid injection that relieved Plaintiff's pain (Tr. 513). However, relief from the steroid injection was temporary (Tr. 513). According to Dr. Narotam's records, he instructed Plaintiff to attempt weight loss and walking several times a day to help alleviate his pain (Tr. 513-514). Plaintiff was to return in one month if weight loss and exercise were not successful (Tr. 514). Plaintiff presented to Dr. Narotam's office on July 9, 2014 and reported that he wanted to proceed with surgery (Tr. 518).

Plaintiff saw Dr. Hungerford (psychiatrist) at the Jasper County Health Department on July 12, 2014 (Tr. 639). He reported that on occasion, his hands shook

so badly that he could not eat (Tr. 639). He also reported getting up several times in the middle of the night to check doors and windows (Tr. 639). He disliked leaving his house, but could not explain why (Tr. 639). In her Axis I Impression, Dr. Hungerford listed obsessive compulsive disorder (provisional) and generalized anxiety disorder (Tr. 640). Plaintiff also saw Dr. Hungerford on August 6, 2014 (Tr. 652). Plaintiff reported that he was anxious about upcoming events. Dr. Hungerford noted that she observed "a fine tremor of the hands" (Tr. 652). Plaintiff was taking Risperdone and Paroxetine (Tr. 652).

Plaintiff underwent back surgery with Dr. Narotam on August 8, 2014 (Tr 539). Dr. Narotam placed a screw at L5-S1, decompressed L4 and L5, and placed additional screws to reduce Plaintiff's spondylolisthesis (Tr. 539-540). Dr. Narotam performed foraminotomies from L4-S1 and a diskectomy at L5-S1 and L4-5 (Tr. 539). Plaintiff returned to Dr. Narotam's office on September 14, 2014 (Tr. 563). He reported moderate aching in his back (Tr. 563). In responding to a questionnaire, Plaintiff reported that he was functioning "much better" since the surgery and he could "stand as long as I want but it gives me extra pain" (Tr. 564, 565). Nurse Practitioner Regina Battles noted that he could return to "light work; 15-30 lbs." (Tr. 564).

Plaintiff saw Dr. Tennison in April 2015 for a "check-up on anxiety medication" (Tr. 597). Plaintiff reported that he was "still having trouble with stress and anxiety and shakes a lot and worried about disability going thru" (Tr. 597). Plaintiff's back pain was "not much better than prior to surgery (Tr. 597). Plaintiff returned to Dr. Tennison in August 2015 for a medication check-up (Tr. 594). Plaintiff was taking Risperdal, Xanax, and Wellbutrin for his depression and severe anxiety disorder (Tr. 595). Plaintiff stated that most of the medications did not sedate him "too much" (Tr. 594). Dr.

Tennison noted that Plaintiff was "overall stable on current meds" and that his back pain was also stable (Tr. 596). Dr. Tennison encouraged him to use the community pool to lose weight, which would help his back and mood (Tr. 596).

Plaintiff also saw Dr. Narotam on August 12, 2015 (Tr. 614). Plaintiff completed a questionnaire in which he reported that the spine surgery had moderately improved his life (Tr. 615). He reported that he was functioning slightly better than he did before surgery (Tr. 616). Plaintiff could not sit for more than an hour or stand for more than 30 minutes (Tr. 616). Dr. Narotam noted that Plaintiff complained of severe back pain at the moment and continued to wear his brace (Tr. 614, 615). Dr. Narotam told him to discontinue using the brace (Tr. 615). Dr. Narotam discharged Plaintiff from his care, noting "Surgery was successful no neurological deficits" (Tr. 615).

In October 2016, Dr. Tennison performed a depression screening (Tr. 934). Plaintiff reported that he felt depressed or hopeless almost every day (Tr. 934). Dr. Tennison's interpretation of the results was "severe depression" (Tr. 934).

Plaintiff started seeing Dr. Pavlovic at the Crawford Memorial Hospital Pain Clinic in late December 2016 (Tr. 907). He reported lower back pain radiating to bilateral hips that "started years ago and intensified recently" (Tr. 907). In 2017 he received four steroid injections, which provided significant but temporary pain relief (Tr. 878, 884, 887, 890, 894, 898, 914-917). After receiving a steroid injection in August 2017, Plaintiff presented to the Crawford Memorial Hospital Emergency Department with moderate hip and thigh pain (Tr. 1606). The ED physician's impression was sciatica (Tr. 1607). Plaintiff received a "bilateral lumbar transforaminal steroid epidural injection" at the pain clinic in February 2018 that provided excellent relief "at one point" (Tr.

1694). In March 2019, Plaintiff saw Dr. Choyce Callahan at the pain clinic (Tr. 1695). Dr. Choyce Callahan believed that Plaintiff's lower back pain appeared to be "sacroiliac radiating into the hips" and recommended a "sacroiliac joint injection" (Tr. 1695). Plaintiff's insurance would not pay for the injection because Plaintiff had not attempted physical therapy (Tr. 1696). Dr. Choyce Callahan noted that Plaintiff was in significant pain and he did not believe Plaintiff could tolerate therapy, but he nonetheless recommended that Plaintiff attempt therapy (Tr. 1696). Plaintiff went to the initial therapy evaluation, but declined to participate further (Tr. 1703). He received the sacroiliac joint injection on June 24, 2019 (Tr. 1705). One month later, Dr. Choyce Callahan noted that Plaintiff was "doing very well" and received excellent pain relief from the joint injection (Tr. 1707)."

On January 13, 2020, Plaintiff returned to pain clinic and advised Dr. Callahan that the injections were helping, the pain always returned. (Tr. 2383). Plaintiff felt the transforaminal injections were helpful and the SI joint injection provided excellent pain relief. (Tr. 2384). He followed up with Dr. Tennison on January 22, 2020 and advised that Xanax was helping keep anxiety under control, but it was no longer covered by insurance. (Tr. 2390).

On January 27, 2020, Dr. Callahan performed another sacroiliac joint injection under fluoroscopic guidance. Plaintiff saw Dr. Tennison on February 21, 2020 and ranked pain 5/10. (Tr. 2371). Plaintiff was weaned off Xanax and Buspar. He started on Vistaril and feels medications are under control. (*Id.*). He had back pain and decreased range of motion. (*Id.*). He saw Dr. Tennison on May 15, 2020 and reported increased anxiety and depression. (Tr. 2366). Toradol injection was helpful and lumbar

radiculopathy down the right leg has resolved. (*Id.*). Norco had pain under control, but thinks he needs an increase. (*Id.*).

On August 4, 2020, Plaintiff saw Dr. Kalin at the pain clinic. (Tr. 2362). Plaintiff has completed 6 week course of Norco and PT, but they did not manage his pain well. (*Id.*). He tolerates opioid treatment and advises it controls his pain. He was prescribed Lyrica. (*Id.*). An August 12, 2000 MRI of Lumbar Spine revealed a mild posterior disc bulge at L3/4 with grade 1 posterior spondylolisthesis of the L3 on L4 suggesting mild adjacent segment disease changes. (Tr. 2360). Plaintiff followed-up with Dr. Kalin on September 8, 2020. (Tr. 2355). He tolerated the Lyrica but no improvement so the Lyrica and Norco were both increased for pain. (Tr. 2357). On October 12, 2020, Plaintiff again saw Dr. Kalin at the pain clinic where his medications were continued and a caudal ESI was ordered. (Tr. 2348).

On October 22, 2020, the caudal ESI was performed by Dr. Kalin. (Tr. 2338).   On December 7, 2020, Plaintiff followed-up on the caudal ESI and advised it provided "tolerable" relief for 2 weeks with gradual return to baseline. (Tr. 2330). Plaintiff was frustrated with continued pain and was offered a prescription for Naloxone. (*Id.*). Dr. Kalin noted that Plaintiff continued to tolerate and require opioid therapy. (*Id.*).

Plaintiff saw Dr. Tennison on December 23, 2020 and requested return to alprazolam for anxiety. (Tr. 2325).  Plaintiff does not sleep well and his stress, anxiety, and depression are all up. (*Id.*). He is more irritable and easily agistated. (*Id.*). Plaintiff is opioid dependent and was counseled about only using as needed. (*Id.*). On January 11, 2021, Plaintiff saw Dr. Kalin at Pain Clinic who noted plaintiff tolerated increased

Lyrica and Norco and felt they were managing his pain. (Tr. 2321). Plaintiff also claimed opioid therapy was better at controlling pain. (*Id.*).

Plaintiff returned to the pain clinic on April 6, 2021 and met with CRNA Joseph Grazaitis who conducted a physical exam and recommended L3-4, L4-5, L5-S1 bilateral diagnostic medial branch blocks before proceeding to radiofrequency ablation at those levels. (Tr. 2309). Plaintiff had paraspinal pain with pressure that increased with extension upon lateral rotational movements. (*Id.*). Plaintiff complained that sitting, standing, and walking for long periods of time were aggravating to his back. (*Id.*). A May 18, 2021 visit with Grazaitis at the pain clinic revealed right sided SI joint dysfunction and the piriformis muscle was tender with palpation. (Tr. 2304). Grazaitis recommended a right sided SI joint injection and a right sided piriformis muscle injection. (*Id.*). On May 18, 2021, Plaintiff rated his back pain 7/10 and advised Norco gives him 75% relief. (Tr. 2302). He advised Grazaitis that piriformis muscle stretching temporarily relieved the pain and sciatic symptoms. (*Id.*). Plaintiff still needed opioid treatment but was offered Naloxone. (*Id.*).

On June 21, 2021, Grazaitis performed a fluoroscopic guided right SI joint injection. (Tr. 2300). Before the procedure, Plaintiff advised his pain was 6/10, but after it was 0/10. (*Id.*). On July 20, 2021, Plaintiff's pain was 7/10 for left SI joint, but he got great relief on right side. (Tr. 2293). On August 9, 2021, Grazaitis performed a fluoroscopic left SI joint injection. (Tr. 2291). Before the procedure, the pain was 9/10, but after it was 3/10. (*Id.*). At an August 31, 2021 follow-up at the pain clinic, Plaintiff reported 100% relief to SI joints, but complained of increased pain on palpation at L4-L5 on both sides with increasing radicular pain down the legs and into feet. (Tr. 2285).

On September 27, 2021, Grazaitis performed a fluoroscopic guided caudal epidural steroid injection with catheter. (Tr. 2283). Before the procedure, his pain was 7/10 and after it was 2/10. (*Id*.). On October 26, 2021, Plaintiff followed up at the pain clinic and reported great relief and said his pain was 5/10 with activity, which was a drastic improvement. (Tr. 2277). He also reported pain to L ankle due to prior malleolus fleck fracture. (*Id*.). He had swelling and nerve irritation with pain going shooting up from ankle to mid calf. (*Id*.). On November 8, 2021, Grazaitis performed an intra-articular injection on the left ankle. (Tr. 2274). On November 23, 2021, Plaintiff saw Grazaitis in follow up for left ankle injection and advised the injection had "substantial relief", but the pain was back (Tr. 2268). Plaintiff also said he had best relief from caudal epidural, but pain was back 8 weeks later.  (*Id*.).

On December 13, 2021, Grazaitis performed another  fluoroscopic guided caudal epidural steroid injection. (Tr. 2266). On January 4, 2022, plaintiff followed up with Grazaitis at Crawford Memorial Hospital for post caudal epidural injection. (Tr. 2697). An MRI of his cervical spine was ordered and he was given a referral to Dr. Harish in Paris. (Tr. 2699). The MRI of Plaintiff's cervical spine occurred on January 7, 2022 and indicative of cervicalgia and revealed "multilevel degenerative spondylitic changes and DDD". (Tr. 2693). On January 27, 2022, Plaintiff had follow-up with Grazaitis who filled out out disability papers. (Tr. 2686). On exam, his rotation and extension had 25% limitation and cervical paraspinal pain with palpation from C5-T1 bilateral. (Tr. 2687). His depression screening also showed little to no interest in activities. (Tr. 2688).  As for the disability report, Grazaitis opined to numerous restrictions and limitations. (Tr. 2419).

ANALYSIS

Plaintiff's claims for SSI and DIB have been reversed and remanded on three separate occasions. Yet, he is back again raising two issues before this Court. First, Plaintiff contends that an updated medical expert review was necessary since the last state agency review was conducted in November 2014. (Tr. 18). Second, Plaintiff claims that the ALJ improperly assessed the disabling opinion of the treating psychiatrist. (*Id.*).

## I.   Updated Medical Expert Review

Plaintiff argues that it was error for ALJ Scully to rely upon the physical assessment conducted by Dr. B. Rock Oh's at the reconsideration level in November 2014 as well as both psychological assessments conducted by Dr. DiFonso and dr. Tin from 2014 because their opinions were based on an incomplete record, and plaintiff obviously underwent medical and mental health treatment after that date. In fact, just a little more than 3 months prior to that, on August 8, 2014, Plaintiff had undergone back surgery with Dr. Narotam, who placed a screw at L5-S1, decompressed L4 and L5, placed additional screws to reduce Plaintiff's spondylolisthesis, performed foraminotomies from L4-S1 and a diskectomy at L5-S1 and L4-5 (Tr. 539). There was no question that additional treatment and therapies would be conducted. In fact, Plaintiff was still seeing Dr. Narotam, yet the ALJ gave little weight to his opinions "because they conflict with normal gait, *mostly* mild physical examination findings, minimally limited range of motion, and degenerative change reflected in the treatment note".

In support of his position, Plaintiff cites to SSR 17-2p, *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016), and *Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018), as amended

on reh'g (Apr. 13, 2018) to support his argument that there must be updated medical expert opinion of the limitations reflected in the opinion evidence submitted since the last review in 2014 because Plaintiff has had evaluations and treatment by treating providers that contain significant, new, and potentially decisive findings that could have reasonably changed the reviewing physician's opinion. (Tr. 18).

In *Stage*, seven months after her RFC assessment, Stage experienced a flare up of pain and followed up with Dr. Richard Oni, an orthopedic surgeon. Following an examination, Dr. Oni reported severe restrictions in the range of motion in her hip, a positive Patrick's sign[6], and degenerative changes. Dr. Oni ordered new tests and advised that Stage needed a total left hip replacement and prescribed additional medications.  On appeal, the Seventh Circuit held that the ALJ erred in accepting the reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage*, 812 F.3d at 1125. Moreover, the Seventh Circuit found it incredulous that the ALJ gave "little weight" to the opinion of Stage's treating physician because of purported inconsistencies and reiterated that a treating physician's opinion is entitled to controlling weight if it is well-supported and not inconsistent with other substantial evidence. *Id.*

In *Moreno*, the Seventh Circuit reiterated the rule holding that, "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno*,

---

[6] Plaintiff also had a positive Patrick's test, which is performed to evaluate pathology of the hip or sacroiliac joint, after the RFC assessments in 2014.

882 F.3d at 728. Moreno, like Plaintiff, had back issues along with mental health concerns and impairments. The ALJ gave great weight to an outdated mental health assessment that indicated improvement to the detriment of subsequent treatment that noted deterioration. Specifically, the ALJ did not address Moreno's treating psychologist's office notes which documented "significant and new developments" in plaintiff's mental health.

Defendant countered that claims cannot continue in perpetuity and that the ALJ reasonably determined that another medical review was not warranted because substantial evidence supported his position; however, this Court disagrees. It is concerning that the Social Security Administration did not appear to address this issue previously, even though Magistrate Judge Daly clearly stated in her opinion of September 21, 2021, "[o]n remand, the ALJ should consider obtaining the opinion of a medical expert on Plaintiff's ability to stand and sit post lumbar fusion surgery.". (Tr. 2114). Indeed, under both *Stage* and *Moreno*, the standard is low. Actual knowledge of a change is not necessary for an updated assessment. Instead, the Seventh Circuit has emphasized that an assessment be updated if significant, new, and potentially decisive findings that could have **reasonably** changed the reviewing physician's opinion. (emphasis added). There is no question that reasonableness exists in this case.

Plaintiff has continued to treat for nine years after the assessments in question. He has undergone diagnostic testing and numerous procedures. It is not up to the ALJ to "play doctor" and determine whether the reviewing physicians' opinions may have changed. It was also not up to the ALJ to make his own determinations and compare the diagnostic imaging results, determining that there were only "mild" changes that

did not warrant an update or reassessment.

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to the conclusion," *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000), and he may not "play doctor" by using his own lay opinions to fill evidentiary gaps in the record. *See Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir.2009). It is an ALJ's responsibility to recognize the need for further medical evaluations of a plaintiff's conditions before making RFC and disability determinations. *See Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir.2011); *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir.2004); *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir.2003); *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir.2000), and here the ALJ should have sought additional evaluations of plaintiff's condition before relying upon an assessment that was almost a decade old. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

## II.      Disabling Opinion of the Treating Psychiatrist

Much of the argument above applies here. Indeed, the Court cannot underscore the importance of an accurate MRFC and has concerns about the great weight given to the assessments performed in 2014 by Dr. Tin and Dr. DiFonso as opposed to the little weight given the consultative assessment performed by Dr. Boyd and Dr. Hungerford, Plaintiff's treating psychiatrist.

While it is true that Dr. Tennison, plaintiff's primary care physician, oversaw plaintiff's prescriptions and made notations on how plaintiff was doing, he was not plaintiff's treating psychiatrist. As Magistrate Judge Daly previously indicated, "[o]n

remand, Dr. Tennison's notes should not be cited as a reason to discount the opinions of Dr. Hungerford, a specialist, without sufficient explanation." This was not done.

Yet again, the ALJ referred to the portions of Dr. Tennison's records that support his RFC and bely the opinions and considerations by Dr. Hungerford and the other mental health providers. The ALJ leaned into the "good days" and discounted the "bad days". Because an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding, remand is appropriate. *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir.2009). In fact, remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

It is also concerning that this issue was addressed by Magistrate Judge Donald Wilkerson in his opinion dated May 8, 2019, *to wit*: 18-cv-1481-DGW (S.D. IL). Indeed, Magistrate Judge Wilkerson held, "The deficiency here is that the ALJ's reasoning for rejecting Dr. Hungerford's opinion is flimsy at best and based on distorted information.". Wilkerson was very concerned with cases involving the evaluation and assessment of mental illness and indicated that the entire record must be viewed as a whole because one day only reflects a single snapshot and says little about overall condition. See *Punzio v. Astrue,* 630 F.3d 704, 711 (7th Cir. 2011); *Scott v. Astrue*, 647 F.3d 734, 737-40 (7th Cir. 2011).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has

not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings. However, it should not be lost on the Commissioner that this is now the fourth time a District Court is reversing and remanding the denial of benefits.

## CONCLUSION

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: September 29, 2022**

*/s/ Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**